**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

WENDY ST. CHARLES

      Plaintiff,

v.

SHERMAN & HOWARD L.L.C., a Delaware Corporation, and JAMES WEAR,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff, Wendy St. Charles, by and through her attorneys, Sweeney & Bechtold, LLC, hereby submits her Complaint against the above-named Defendants as follows:

**<u>INTRODUCTION</u>**

      1.    This is an employment discrimination suit brought by a former attorney who was terminated from her employment with Defendant Sherman & Howard, L.L.C. ("Sherman & Howard" or "the firm") in retaliation for her complaints about a pattern of severe sexual harassment and a hostile work environment created by one of her supervisors, attorney James Wear.  Plaintiff St. Charles asserts claims against the firm of sex discrimination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and of retaliation against her for having engaged in protected activity by reporting Defendant Wear's sexual harassment, also in violation of Title VII.  Plaintiff asserts claims against Sherman & Howard of wrongful discharge in violation of public policy, negligent

infliction of emotional distress, and outrageous conduct under Colorado common law.  Plaintiff

asserts claims against Defendant James Wear of negligent infliction of emotional distress,

intentional interference with contract and outrageous conduct under Colorado common law.

## PARTIES

2.      Plaintiff Wendy St. Charles is a resident of the State of Colorado.

3.      Defendant James Wear is a resident of the State of Colorado.

4.      Defendant Sherman & Howard L.L.C. ("Sherman & Howard") is a Delaware

limited liability company authorized to do business in Colorado.

5.      Sherman & Howard has its principle place of business at 633 17th Street, Suite

3000 in Denver, Colorado 80202 and maintained a satellite office in Vail, Colorado until April

30, 2014.

6.      Sherman & Howard is engaged in the business of providing legal services,

including in the area of employment and labor law.

7.      Sherman & Howard has over 500 employees.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367,

and specifically, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

*et seq.* (Title VII).

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because

the conduct and employment practices alleged to be unlawful were committed within the District

of Colorado.

10.     At all relevant times, Sherman & Howard was covered by the definition of

2

"employer" set forth in 42 U.S.C. § 2000e(b) of Title VII.

11.     All procedural prerequisites for the filing of this suit have been met.  Plaintiff

filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission

("EEOC") and received her Notice of Right to Sue on November 12, 2014.

## SPECIFIC ALLEGATIONS

12.     Plaintiff was hired by the law firm Wear, Travers & Perkins in November 2006 as

an Associate Attorney in its Vail, Colorado office.

13.     In April 2008, Sherman & Howard acquired Wear, Travers & Perkins in a merger.

14.     In conjunction with the merger, Plaintiff joined Sherman & Howard as a Senior

Associate.

15.     At all relevant times, Plaintiff worked at Sherman & Howard's satellite office in

Vail, Colorado.

16.     Plaintiff was employed by Sherman & Howard until her termination on April 30,

2014.

17.     Throughout her employment, Plaintiff performed her job duties satisfactorily.

18.     Plaintiff worked primarily with two equity members at the Vail office, James

Wear and Richard Travers.

19.     Prior to the merger, Mr. Wear told Plaintiff that she would be a partner within two

years given her productivity and successful client generation.

20.     Following the merger, Plaintiff received compliments from management on the

good job that she was doing to build her practice.

21.     Throughout Plaintiff's employment, Mr. Wear engaged in a pattern of sexually

harassing behavior at work, including making inappropriate, offensive, and graphic comments to Plaintiff directly and in the presence of other co-workers about, among other things, Plaintiff's breasts and buttocks, the size of Mr. Wear's penis, his use of pornography at the office, his sexual performance, and intimate details of his sex life.

22.     When Mr. Wear asked Plaintiff to drive him home after a firm holiday dinner in 2008 because he was intoxicated, Mr. Travers and support staff member Sharman Keller-Green intervened to prevent Plaintiff from taking him home as they expressed concern that Mr. Wear could not be trusted alone in her company.

23.     During a ski trip with the Vail office staff in 2009, Mr. Wear expressed his sexual desire for a female associate in her 20s, followed her around throughout the evening, and said that he believed that she "wanted" him.

24.     Mr. Wear made repeated comments to Plaintiff regarding his sexual desire for a Sherman & Howard attorney who worked at the Denver office following the employee's divorce; he claimed to be obsessed with the employee's "hot body" and the size of her breasts.

25.     Mr. Wear openly boasted to Plaintiff and other employees that he spent considerable time watching pornography during work hours in his office.

26.     Mr. Wear said that he found it humorous that Sherman & Howard was aware that he was watching pornography and that the IT department had to implement new means to monitor what he was watching.

27.     Mr. Wear openly discussed and boasted about attending "cocaine parties," including while attending conferences on firm business, and that, at these parties, he and his friends were able to get young women to engage in lewd sexual acts because they were "so

4

fucked up on drugs."

28.     Mr. Wear boasted about his sexual stamina and that he boosted it with testosterone supplements.

29.     Mr. Wear requested that Plaintiff represent wealthy, single female clients so that he would be able to pursue dating them.

30.     Mr. Wear boasted about his ability to trick women into sleeping with him and it would be several months before they realized that he "didn't have any money."

31.     Mr. Wear told Plaintiff to take her shirt off so that he could take her blood pressure.

32.     Mr. Wear, Mr. Travers, and Ms. Keller-Green frequently discussed their amusement with what they described as office "cat fights" among and between female staff and female attorneys.

33.     Mr. Wear regularly referred to other former and current female attorneys as "bitches."

34.     Mr. Wear repeatedly made comments to Plaintiff about her body, including, among other things, Plaintiff's breasts and buttocks, and the attractive fit and appearance of Plaintiff's clothing.

35.     In front of other Vail office employees, Mr. Wear commented that Plaintiff should date one of his friends in the Vail Valley who funded breast augmentations for his girlfriends.

36.     Mr. Wear used humiliating language to describe Plaintiff, including, but not limited to: saying that Plaintiff looked like "a young pup from the rear until you see [Plaintiff's] face"; describing women Plaintiff's age as being "sexually desperate" and "sexually frustrated";

and commenting that women Plaintiff's age were not sexually appealing to men who live in Vail.

37.     Mr. Wear asked Plaintiff whether she slept with the men that she dated and criticizing her for not doing so.

38.     Mr. Wear followed such remarks by asking Plaintiff if she was "horny."

39.     As Plaintiff continued to reject Mr. Wear's flirtatious overtures and refused to engage in discussions about sex, Mr. Wear became more aggressive, calling Plaintiff crude and demeaning names including a "fucking bitch" and a "fucking pain in the ass."

40.     Mr. Wear would sometimes bring his puppy to the office and, to display his temper, violently kick his puppy away from greeting Plaintiff.

41.     On more than one occasion, Mr. Wear raised his arm at Plaintiff as if to strike her if she did not get out of his office or out of his way.

42.     On days when Mr. Wear behaved in a physically aggressive manner, Plaintiff felt compelled to stay in her office with the door closed.

43.     Mr. Wear's behavior caused Plaintiff considerable distress and her health deteriorated throughout the remainder of her employment.

44.     Plaintiff has a physical disability that limits her ability to use her right arm.

45.     Plaintiff requires assistance to type, file, or do other secretarial tasks in an efficient manner and made numerous requests for such assistance.

46.     In response to her request for skilled secretarial support, Plaintiff's colleagues, including Mr. Wear, Mr. Travers, and Ms. Keller-Green, frequently referred to her as, among other things, "needy," a "pain in the ass," a "fucking bitch," and a "fucking pain in the ass."

47.     Sherman & Howard hired Heather Cunningham to serve as a paralegal and Mr.

Wear and Mr. Travers's secretary around February 2011.

48.     A few months after Ms. Cunningham's hire, Mr. Wear began to engage in a pattern of sexually harassing behavior toward Ms. Cunningham, including asking Ms. Cunningham for nude pictures of herself; frequently inquiring into the details of her sex life; making inappropriate and sexually suggestive comments including describing intimate details of his sex life to her during the work day; exposing her to pornography including directing her to transfer pornographic images from his cell phone to his work computer; staring at and commenting on her breasts and buttocks; and sending sexually charged e-mails to her.

49.     After the last support staff member in the Vail office who was specifically assigned to assist Plaintiff left the firm in June 2012, Sherman & Howard failed to provide Plaintiff with another assistant in the Vail office.

50.     In the fall of 2012, Plaintiff attempted to engage Mr. Travers in discussions about the issues that she was experiencing, including Mr. Wear's behavior and her lack of secretarial assistance, but he declined or ignored her meeting requests.

51.     Throughout the fall of 2012, Plaintiff made numerous attempts to request assistance from the firm regarding the work environment in the Vail office, including visiting Melody Allen, the Director of Sherman & Howard's Human Resources (HR) Department, at the firm's Denver office and calling and e-mailing Ms. Allen and another HR employee.

52.     Throughout December 2012, Ms. Keller-Green refused requests from Plaintiff for assistance with client matters.

53.     In late December 2012, Mr. Wear told Plaintiff and Ms. Cunningham that he was inviting girls over to see his "huge Christmas tree," referring to his penis.

54.     During that same conversation, Mr. Wear invited Plaintiff and Ms. Cunningham to see his "huge Christmas tree."

55.     Ms. Cunningham resigned abruptly in late December 2012.

56.     In late December 2012, Ms. Keller-Green responded to a request from Plaintiff for assistance with a client matter with an unexpected and emotional outburst.

57.     Plaintiff reported the incidents between herself and Ms. Keller-Green to Sherman & Howard's HR Department.

58.     Mr. Travers later admonished Plaintiff for "going to Denver" for help and instructed her that what happens in the Vail office needs to be dealt with "in Vail."

59.     Plaintiff then requested a meeting with Ken Siegel, a member of Sherman & Howard's Executive Committee.

60.     Plaintiff met with Mr. Siegel on January 7, 2013.

61.     During that meeting, Plaintiff told Mr. Siegel that she was uncomfortable working at the Vail office; she had been ostracized by Mr. Wear, Mr. Travers, and Ms. Keller-Green; she was experiencing increasing difficulty with her work as a result; and the work environment at the Vail office had become so hostile that she was recently prescribed antidepressants to help her cope.

62.     Mr. Siegel acknowledged that the circumstances at the Vail office were unfortunate, but that the firm had no plans to take any mitigating actions.

63.     In response, Plaintiff asked Mr. Siegel if the firm would like her to resign.

64.     Mr. Siegel responded that the firm did not want Plaintiff to resign but he failed to offer any solutions to the problems at the Vail office that Plaintiff described other than to tell

Plaintiff to keep taking her antidepressants if she needed them.

65.     In January 2013, the firm's general counsel, Joe Bronesky, informed Plaintiff that Ms. Cunningham had filed a complaint against the firm and remarked that Ms. Cunningham was foolish to do so.

66.     In Ms. Cunningham's complaint she alleged, among other things, that Mr. Wear had sexually harassed her and created a hostile work environment in the Vail office.

67.     Mr. Wear boasted to Plaintiff and other employees at the Vail office that the management of Sherman & Howard supported him in defending against Ms. Cunningham's claim and that Ms. Cunningham would regret filing it.

68.     Plaintiff responded that she was not surprised by the complaint given his conduct toward Plaintiff and other women.

69.     Mr. Wear told Plaintiff that Ms. Cunningham included the story about him asking Ms. Cunningham to see his huge Christmas tree in her complaint.

70.     Mr. Wear then claimed that Ms. Cunningham had made the story up to get him into trouble with the firm.

71.     Plaintiff reminded Mr. Wear that he had made the same comment to her.

72.     Sherman & Howard failed to interview Plaintiff regarding the substance of Ms. Cunningham's complaint.

73.     In late December/early January 2013, the firm hired Stacey Thibedeau to replace Ms. Cunningham.

74.     In late January 2013, when Mr. Wear and Ms. Keller-Green were out of the office, Ms. Thibedeau, who had only been at the firm for a few weeks, asked Plaintiff if she

could speak with her in confidence.

75.    During that hour-long conversation, Ms. Thibedeau stated that Mr. Wear was engaging in behaviors that she found demeaning, including snapping his fingers at Ms. Thibedeau to get her attention and expecting Ms. Thibedeau to crawl under his desk to retrieve trash.

76.    Immediately following this conversation with Ms. Thibedeau, Plaintiff told Ms. Allen about Ms. Thibedeau's complaints.

77.    Plaintiff asked Ms. Allen to be discreet in sharing this information given the tensions in the Vail office and Plaintiff's fear of retaliation.

78.    After Mr. Wear and Ms. Keller-Green returned to the office in early to mid-February 2013, Ms. Thibedeau became abrupt, accusatory, and resentful to Plaintiff.

79.    Ms. Thibedeau told Plaintiff that Ms. Keller-Green had instructed Ms. Thibedeau to keep a copy of everything Plaintiff did and said and that she may need to protect herself against complaints to HR by Plaintiff.

80.    In approximately February 2013, Plaintiff moved to a different office space at the Vail office to avoid further confrontations with Ms. Keller-Green.

81.    The move involved transferring numerous client files from Plaintiff's old space to the new one and, because of Plaintiff's disability she required assistance.

82.    Ms. Keller-Green and Ms. Thibedeau refused to assist Plaintiff and, on at least one occasion, Mr. Wear stopped at Plaintiff's door and sarcastically stated that, "it looks like your move is going really slow"; he then laughed and asked "can't you get any help?"

83.    Plaintiff continued to inform Ms. Allen about the hostile work environment at the

Vail office.

84.     A month passed before Plaintiff received any assistance in moving to her new office.

85.     Based upon Plaintiff's complaints about the work environment, Ms. Allen agreed to visit the Vail office in March 2013.

86.     During her visit, Ms. Allen was accompanied by Terri Schroeder, a private consultant that Sherman & Howard had previously used to assist with staff conflicts.

87.     Plaintiff met with Ms. Allen and Ms. Schroeder for approximately three hours at a location away from the Vail office.

88.     During that meeting, Plaintiff described the hostile work environment at the Vail office.

89.     During that meeting, Ms. Allen asked Plaintiff if Mr. Wear had ever made comments about her body parts to which Plaintiff responded that he had, including about her breasts.

90.     Following the meeting, Ms. Schroeder expressed concerns about Plaintiff's health.

91.     Ms. Schroeder advised Plaintiff that resolving complaints regarding hostile work environments was outside of her expertise.

92.     Neither Ms. Schroeder nor Ms. Allen provided Plaintiff with any advice regarding how to deal with her work situation.

93.     After that meeting, Plaintiff attempted for months to meet with Mr. Travers and Mr. Wear to discuss Mr. Wear's demeaning treatment toward women in the office.

94.     Mr. Wear and Mr. Travers ignored and then criticized Plaintiff's attempts to communicate about this subject.

95.     Plaintiff began working more from home to avoid interacting with Mr. Wear and Mr. Travers at the office.

96.     Plaintiff reported to Ms. Allen and Mr. Bronesky that she was having trouble focusing on her work because of her deteriorating health resulting from ongoing exposure to the hostile work environment.

97.     In March 2013, Ms. Cunningham filed a charge of discrimination against Sherman & Howard with the EEOC.

98.     The EEOC later conducted an investigation of Ms. Cunningham's charge and determined that a violation of Title VII had occurred during her employment with Sherman & Howard.

99.     Through April 2013, Mr. Wear's behavior toward Plaintiff became increasingly volatile and aggressive.

100.     In early May 2013, Plaintiff was contacted by Diana Wendel, a member of Sherman & Howard's Executive Committee.

101.     Ms. Wendel scheduled a time to meet with Plaintiff privately on May 7, 2013 at a location away from the Vail office to purportedly "provide support" to Plaintiff.

102.     Plaintiff understood that the conditions at the Vail Office, including Mr. Wear's conduct and Plaintiff's health concerns, would be addressed at this meeting.

103.     Plaintiff experienced a great deal of distress at the prospect of sharing embarrassing and humiliating details with Ms. Wendel about the hostile work environment at the

Vail office.

104.     Before the meeting on May 7, Plaintiff called Ms. Wendel to request that they reschedule the meeting for a time when Plaintiff was more composed.

105.     Ms. Wendel insisted that the meeting proceed and she assured Plaintiff that the meeting would be helpful.

106.     Ms. Wendel arrived at the meeting with Bill Wright, Chair of Sherman & Howard's Labor Law department, whom Plaintiff had never met.

107.     Plaintiff informed Ms. Wendel and Mr. Wright that she was not comfortable discussing the details of Mr. Wear's conduct in front of Mr. Wright because she found the details so humiliating.

108.     Plaintiff requested that she and Ms. Wendel discuss the matter privately.

109.     Ms. Wendel and Mr. Wright denied this request.

110.     Mr. Wright expressed that he was not interested in discussing Mr. Wear's conduct.

111.     Instead, Mr. Wright aggressively questioned Plaintiff about her compensation and her complaints regarding the lack of skilled secretarial assistance.

112.     Plaintiff expressed that she was embarrassed to be questioned in such an aggressive way in a public setting and that she was having trouble focusing.

113.     Mr. Wright and Ms. Wendel insisted that Plaintiff refrain from any further discussion of Mr. Wear's conduct and, instead, directed Plaintiff to appear at a meeting with Mr. Wear and Mr. Travers at which time they would discuss committing to good future conduct.

114.     Plaintiff expressed that she was not well enough to attend such a meeting and

believed it was impossible to overcome the impact of Mr. Wear's past conduct and her concern about continued retaliation without an honest discussion about Mr. Wear's conduct and the hostile work environment that it had created.

115.   Plaintiff pleaded with Ms. Wendel and Mr. Wright to consider the toll that Sherman & Howard's handling of her complaints was taking on her health.

116.   Mr. Wright responded that his job was to "protect the institution," not any person in it.

117.   In the evening of May 7, 2013, Plaintiff drafted an email to Ms. Wendel expressing concern regarding Mr. Wright's conduct in the meeting.

118.   In the May 7, 2013 e-mail, Plaintiff relayed her intention to resign.

119.   Ms. Wendel pressed Plaintiff for a precise departure date.

120.   Plaintiff responded that, due to her deteriorating health, she needed time to arrange for a relocation of her practice as she had not planned to resign.

121.   Ms. Wendel insisted that Plaintiff adhere to a separation date of June 30, 2013.

122.   Plaintiff informed Ms. Wendel that she was not prepared to move her practice in that short amount of time and was not prepared to do so given her deteriorating health.

123.   Ms. Wendel and Mike Sanchez, the Chair of Sherman & Howard's Executive Committee, called Plaintiff and admonished her for allegedly delaying her departure from the firm.

124.   Mr. Sanchez accused Plaintiff of "playing games" because she had not reduced her allegations against Mr. Wear to writing.

125.   Over the course of the following week, Plaintiff drafted a letter to Mr. Sanchez

with specific details about Mr. Wear's hostile and inappropriate conduct.

126.    On June 4, 2013, Plaintiff delivered the letter to Mr. Sanchez.

127.    After receiving the letter from Plaintiff, Mr. Sanchez allowed Plaintiff to withdraw her resignation while Sherman & Howard conducted an investigation, provided that she cooperate with Sherman & Howard's investigation.

128.    In the following week, Plaintiff was directed by Sherman & Howard to meet within 48 hours with Heather Vickles, an attorney at Sherman & Howard's Denver office and Chair of Sherman & Howard's Equal Employment Opportunity Committee.

129.    Plaintiff agreed to meet Ms. Vickles in Georgetown, Colorado.

130.    During Plaintiff's meeting with Ms. Vickles, Plaintiff described the behavior of Mr. Wear to Ms. Vickles.

131.    In late June 2013, Plaintiff called Ms. Vickles and requested a status on the firm's investigation, as Plaintiff desired to return to the Vail office to resume her practice.

132.    During that call, Ms. Vickles explained that she was behind on work but expected to complete the investigation soon.

133.    In early July 2013, Ms. Wendel encouraged Plaintiff to attend a real estate symposium with her, as well as Mr. Wear and Mr. Travers.

134.    Although Plaintiff wanted to attend the symposium, her physician advised against having exposure to Mr. Wear and those endorsing his conduct.

135.    Plaintiff told Ms. Wendel and Ms. Vickles that, in giving consideration to attending, it would be helpful to know the outcome of the firm's investigation.

136.    Neither Ms. Wendel nor Ms. Vickles would comment other than to say that

Sherman & Howard was "close" to concluding the investigation.

137.   Plaintiff decided not to attend the real estate symposium.

138.   After Plaintiff decided against attending the symposium, Ms. Vickles ceased returning Plaintiff's phone calls.

139.   On or about July 12, 2013, Ms. Vickles advised Plaintiff that the internal investigation was complete and that Plaintiff would only learn the outcome of the investigation by attending an in-person meeting with Ms. Vickles and a member of the firm's Executive Committee.

140.   Plaintiff requested that she be permitted to attend the meeting by phone, but this request was denied.

141.   Based upon a recommendation from Plaintiff's physician, Plaintiff requested that she be permitted to bring someone with her to the meeting to provide her with support.

142.   Ms. Vickles also denied this request.

143.   On July 18, 2013, Plaintiff met with Ms. Vickles and Ms. Wendel in Vail, Colorado.

144.   During this meeting, Ms. Vickles informed Plaintiff that:

   a.   she had found no evidence of any inappropriate conduct by Mr. Wear after October 2013;

   b.   the investigation concluded that Plaintiff was abrupt with female staff;

   c.   Plaintiff was purportedly disruptive to the Vail office; and

   d.   Plaintiff's options were to work from home, commute to Denver, or resign.

145.    Ms. Vickles provided no details regarding how Plaintiff would transition her practice to her home.

146.    Commuting to Denver would commit Plaintiff to a daily round-trip commute of approximately 200 miles.

147.    Mr. Sanchez sent Plaintiff a letter on July 17, 2013 in which he stated that "the working relationships between [Plaintiff] and others in the Vail office may be beyond repair" and pressed Plaintiff to communicate her decision between working from home, transferring to Denver, and resigning by July 31, 2013.

148.    Plaintiff attempted to work from home in June and July 2013.

149.    Sherman & Howard failed to provide Plaintiff with office equipment, other than a laptop, or assistance with mail, scanning, printing, phones, or other administrative needs.

150.    Sherman & Howard continued to charge Plaintiff overhead for a fully staffed and equipped office.

151.    In late July 2013, Plaintiff contacted the EEOC.

152.    On July 31, 2013, Plaintiff sent a letter to Sherman & Howard in which she expressed, among other things, that an independent investigation was needed.

153.    In early August 2013, Sherman & Howard informed Plaintiff that, unless she maintained billable hours, her compensation would terminate and that she would be required to repay distributions that exceeded her 2013 receivables.

154.    Plaintiff filed EEOC Charge of Discrimination number 846-2013-44757 against Sherman & Howard on August 15, 2013.

155.    Plaintiff continued to attempt to work from home on a limited basis through

February 2014 while undergoing medical treatment for her deteriorated health.

156.     Sherman & Howard criticized Plaintiff for spending so much time on non-billable items and pressured her to perform more billable work.

157.     Based upon the recommendation of her physician, Plaintiff wound down her practice and ceased working altogether in February 2014.

158.     Plaintiff's physician concluded that her diminished cognitive and executive functioning was the result of a strained, hostile work environment and with resulting trauma.

159.     In February 2014, Mr. Wright informed Plaintiff that she would be required to repay distributions that exceeded her 2013 receivables.

160.     Sherman & Howard closed the Vail office on April 30, 2014.

161.     Sherman & Howard terminated Plaintiff on April 30, 2014.

162.     On November 12, 2014, the EEOC issued a Notice of Right to Sue in connection with Charge of Discrimination number 846-2013-44757.

## FIRST CLAIM FOR RELIEF
(Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended against Defendant Sherman & Howard, L.L.C.)

163.     The foregoing allegations are realleged and incorporated herein by reference.

164.     Sherman & Howard subjected Plaintiff to different terms and conditions of her employment based on sex, including by: subjecting her to sufficiently severe or pervasive unwelcome sexual harassment so as to alter the conditions and terms of her employment; condoning or tolerating the creation by co-employees of a hostile work environment based on her sex; and interfering with her ability to work.

165.     Sherman & Howard's actions taken against Plaintiff were done knowingly and

intentionally or with reckless disregard of her rights.

166.    Sherman & Howard's conduct discriminated against Plaintiff on the basis of her sex in violation of Title VII.

167.    As a direct and proximate result of Sherman & Howard's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

**SECOND CLAIM FOR RELIEF**
(Retaliation in violation of Title VII of the Civil Rights Act, as amended
against Defendant Sherman & Howard, L.L.C.)

168.    The foregoing allegations are realleged and incorporated by reference.

169.    Plaintiff participated in statutorily protected activity by opposing practices targeted at her and her co-workers that were unlawful under Title VII, including discrimination and harassment based on gender.

170.    As a result of Plaintiff's protected opposition to discrimination and harassment, Sherman & Howard retaliated against her by subjecting her to the different terms and conditions of employment as described in this Complaint, and ultimately interfering with her ability to work.

171.    Sherman & Howard's actions taken against Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

172.    Sherman & Howard's conduct violated 42 U.S.C. 2000e-3(a) of Title VII.

173.    As a direct and proximate result of Sherman & Howard's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary

losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

### THIRD CLAIM FOR RELIEF
(Outrageous Conduct/Intentional Infliction of Emotional Distress
against Defendant Sherman & Howard, L.L.C. and Defendant James Wear)

174.    The foregoing allegations are realleged and incorporated by reference.

175.    Defendants' course of conduct towards Plaintiff as described in this Complaint is so severe in degree that it goes beyond the bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

176.    Defendants' actions were extreme and outrageous and were done with the intent of causing Plaintiff severe emotional distress.

177.    Defendants' conduct was malicious, willful and/or wanton, and exhibited reckless or callous indifference to Plaintiff's protected rights.

178.    As a proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer loss of pay, salary and benefits, loss of job, loss of career opportunities, emotional distress, inconvenience, mental anguish, and related injuries of a similar nature.

### FOURTH CLAIM FOR RELIEF
(Negligent Infliction of Emotional Distress
against Defendant Sherman & Howard, L.L.C. and Defendant James Wear)

179.    The foregoing allegations are realleged and incorporated by reference.

180.    Defendants' course of conduct towards Plaintiff as described in this Complaint created an unreasonable risk of causing bodily harm or emotional disturbance to Plaintiff.

181.    Defendants' course of conduct caused emotional disturbance to Plaintiff that resulted in physical manifestations and/or continued mental disturbance.

Case 1:14-cv-03416-RM-CBS   Document 1   Filed 12/18/14   USDC Colorado   Page 21 of 24

182.     As a proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer loss of pay, salary and benefits, loss of job, loss of career opportunities, emotional distress, inconvenience, mental anguish, and related injuries of a similar nature.

**FIFTH CLAIM FOR RELIEF**
(Wrongful Discharge in Violation of Public Policy
against Defendant Sherman & Howard, L.L.C.)

183.     The foregoing allegations are realleged and incorporated by reference.

184.     Sherman & Howard terminated Plaintiff from her employment in retaliation for exercising a job-related right or privilege, and/or engaging in conduct that was protected or encouraged as a matter of public policy.

185.     In so doing, Sherman & Howard undermined clearly expressed public policies including, but not limited to those set forth in the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-301, *et seq.*, which prohibits sex discrimination and retaliation in the workplace.

186.     The policies set forth in the CADA are policies that truly impact the public.

187.     Sherman & Howard's actions, which culminated in the termination of Plaintiff, were taken with the knowledge of Plaintiff's good faith belief that she was opposing conduct proscribed by public policy, and, therefore, were willful and wanton.

188.     As a proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer loss of pay, salary and benefits, loss of job, loss of career opportunities, emotional distress, inconvenience, mental anguish, and related injuries of a similar nature.

## SIXTH CLAIM FOR RELIEF
(Tortious Interference with Contract
against Defendant James Wear)

189.    The foregoing allegations are realleged and incorporated by reference.

190.    Plaintiff had an employment contract with Sherman & Howard.

191.    Mr. Wear knew or reasonably should have known of this contract.

192.    Mr. Wear, by words and/or conduct, intentionally caused Sherman & Howard not to perform or terminate the contract with Plaintiff, or interfered with Sherman & Howard's performance of the contract causing Sherman & Howard not to perform or to terminate the contract with Plaintiff.

193.    Mr. Wear's interference with the contract was improper.

194.    As a proximate result of Mr. Wear's actions, Plaintiff has suffered and continues to suffer loss of pay, salary and benefits, loss of job, loss of career opportunities, emotional distress, inconvenience, mental anguish, and related injuries of a similar nature.

WHEREFORE, Plaintiff Wendy St. Charles respectfully requests that this Court enter judgment in her favor and against Defendants and order the following relief as allowed by law:

A.     Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B.     Back pay and benefits;

C.     Reinstatement or front pay and benefits;

D.     Injunctive and/or declaratory relief;

E.     Punitive damages as allowed;

F.      Attorney fees and costs of the action, including expert witness fees, as appropriate;

G.      Pre-judgment and post-judgment interest at the highest lawful rate; and

H.      Such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted December 18, 2014

By:     s/Charlotte Sweeney

SWEENEY & BECHTOLD, LLC
650 S. Cherry St., Ste. 610
Denver, CO 80246
Telephone: (303) 865-3773
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
1472 Buffehr Creek Road
Vail, CO 81657

**CERTIFICATION OF GOOD STANDING**

I hereby certify that I am a member in good standing of the bar of this Court.


By:      s/Charlotte Sweeney

SWEENEY & BECHTOLD, LLC
650 S. Cherry St., Ste. 610
Denver, CO 80246
Telephone: (303) 865-3773
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF